UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEHI COMPUTER PRODUCTS, INC.,

                Plaintiff,                No. 04-CV-72002-DT

vs.                                      Hon. Gerald E. Rosen

ESTATE OF JEFFREY EARL SEHI,

                Defendant.
_____/

OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on        July 15, 2005

PRESENT:  Honorable Gerald E. Rosen
                     United States District Judge

I.  INTRODUCTION

      This breach of contract action involves a Stock Repurchase Agreement executed by all of the shareholders of Sehi Computer Products, Inc. ("Sehi Computer") on August 31, 1989, and the enforcement of an April 17, 2003 agreement between the shareholders concerning the value of the shares upon the death of a shareholder.

      This matter is presently before the Court on Plaintiff's Motion for Summary Judgment. Defendant has responded to the Motion to which Response, Plaintiff has replied. Having reviewed and considered Plaintiff's Motion, the parties' briefs and

1

supporting evidence, the Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

Plaintiff Sehi Computer is a closely-held Michigan-based corporation. The corporation was formed in 1983 by Charles Sehi as "Procomp Computer Products, Inc." [*See* Plaintiff's Reply Brief, Ex. A.] In 1996, the company's name was changed to "Sehi Computer Products, Inc." [Reply Brief, Ex. B].[1]  Sehi Computer originally was engaged in the business of selling Hewlett Packard computer equipment to educational institutions and public school districts. In the 1990s the company expanded and set up operations in California. Charles Sehi's son, Jeffrey Earl Sehi, served as Vice President of Sales in California.

Charles Sehi had five children. All of the children were involved in the company business at one time or another. Although Mr. Sehi originally owned 100% of the shares of the company's stock, in 1989, he began an annual gift-giving program to give shares of stock in the company to his children.

In order to participate in the gift-giving program, each of Sehi's children were required to sign a Stock Repurchase Agreement (sometimes referred to by the parties as a

---

[1]  The evidence of the company's name change -- i.e., the copies of the records filed with the Michigan Department of Commerce - Corporation and Securities Bureau -- demonstrates the lack of merit in Defendant's argument that Sehi lacks standing to seek enforcement of an Agreement entered into by Procomp Computer Products.

"Buy/Sell Agreement") which restricted their rights to sell, assign or transfer their shares. All of Mr. Sehi's children welcomed the gifts of shares and agreed to and did sign the Stock Repurchase Agreement. [*See* Plaintiff's Ex. 1, p. 15; *see also* Affidavits of Charles A. Sehi, Mark L. Sehi, Scott A. Sehi, Nancy M. Sehi, and Craig C. Sehi at Plaintiff's Exhs. 2-6.]

> In pertinent part, the Stock Repurchase Agreement provides as follows:
>
> During the continuance of this Agreement, the Stockholders shall not sell, pledge, hypothecate, encumber, transfer or assign all or any part of their respective stock interest in the Corporation except as hereinafter provided.

[*See* Ex. 1, Art. I, § 101 at p. 2.]

> Section 401 of Article IV of the Agreement further provides:
>
> Upon the death of any Stockholder, the Corporation shall have the option to purchase or redeem all, but not less than all, such deceased Stockholder's shares.  Such option shall be exercisable only within a period of thirty (30) days after the death of the deceased Stockholder.  The purchase or redemption of the Shares shall be at the price set forth in the Article entitled "Valuation," with the closing and the terms of payment as set forth in the Article entitled "Closing."

*Id.*, "Transfer at the Death of a Stockholder," Art. IV, § 401 at p. 6.

Article V is the section of the Agreement entitled "Valuation" and it provides, in pertinent part, as follows:

> Section 501.  Book Value.  **Subject to the overriding provision of the Section entitled "Stipulated Price,"** the purchase price of the shares to be sold pursuant to the Article entitled "Transfer at the Death of a Stockholder" shall be the greater of:
>
> (i) **The product of the number of shares owned by the**

3

> **deceased Stockholder times a Price Per Share defined as the book value** of a share on the last day of the month immediately preceding the date of the Stockholder's death. . .;
> **or**
>
> (ii) **A sum equal to the total face value of life insurance, if any, which the Corporation may hold and recover on the life of the deceased Stockholder** pursuant to the Article VII entitled "Funding by Life Insurance."

> Section 502.  Stipulated Price.  **Notwithstanding the provisions of the Section entitled "Book Value," the Stockholders and the Corporation may, from time to time, agree that the purchase price pursuant to this Agreement shall be an amount which has been agreed to by them rather than an amount to be determined under the valuation method provided in the Section entitled "Book Value."**  To be effective, such an agreement must be (1) in writing; (2) signed by the now deceased Stockholder and each of the non-deceased Stockholders; and approved by the Corporation's Board of Directors. . . .

*Id.*, Art. V, §§ 501-502 at pp. 7-9 (emphasis added).

All of his children having agreed to and executed the Stock Repurchase Agreement, in 1989, Mr. Sehi commenced annual gifts of shares of stock to his children. The face of each stock certificate issued by the corporation to each of the Sehi children over the course of the ensuing years included the disclosure "See Endorsement on Back." The back of each certificate contained a restrictive endorsement notifying any potential holder of the certificate that

> The Shares of Stock represented by this certificate are subject to and transferable only in compliance with an Agreement dated August 31, 1989, between the Stockholders of the Corporation and the Corporation. . . .

[*See* Plaintiff's Ex. 7.]

4

In 1997, Sehi Computer acquired the first of three life insurance policies worth $500,000 each on the life of its Vice-President, Jeffrey E. Sehi.[2] One $500,000 policy, an "Executive Benefit Policy," was owned by Jeffrey Sehi. Jeffrey had the discretion under this policy to designate a beneficiary, which he did -- he designated his wife, Judith Sehi, as sole beneficiary. The second and third $500,000 policies were owned by the Corporation and the Corporation was the designated beneficiary on these two policies. One of these latter policies was a "Key-Man" insurance policy and the other was a "Buy/Sell' insurance policy which funded the Stock Repurchase Agreement.[3]

In early 2003, one of the Sehi children, Scott Sehi, posed a question to the Corporation's insurance underwriter, which was forwarded to the company's attorney, regarding the life insurance policies owned by the corporation on his life and the Stock Repurchase Agreement. Specifically, the issue raised by Scott was the following:

> Upon Scott's death would the entire face value of the life insurance owned by the corporation on Scott's life pass to his beneficiaries in exchange for his stock, or whether his beneficiaries would receive only the amount of life insurance equal to his stock in the corporation with the remaining life

---

[2] Similar life insurance policies were obtained for Mark, Scott and Nancy Sehi. [*See* Defendant's Ex. 5.]

[3] Section 701 of the Stock Repurchase Agreement provides:

> To provide funds for the purchase of a deceased Stockholder's shares, the Corporation may, but need not, purchase and be the owner and beneficiary of life insurance policies in any amount which the Corporation deems advisable.

[Plaintiff's Ex. 1, Article VII, § 701.]

5

insurance passing to the corporation?

[*See* Defendant's Ex. 5, p. 1.]  Scott obviously wanted the entire amount of the life insurance to pass to his beneficiaries.  *Id.*

The Corporation's attorney, John Kelly, responded to Scott's question by way of a letter sent to all of the Sehi Stockholders, including Defendant's decedent, Jeffrey Earl Sehi.  *See id.*  Kelly's letter stated, in pertinent part, as follows:

> This issue is important for those of you whose ownership in the corporation is less than the amount of life insurance the corporation owns on your life. . . .
>
> * * *
>
> For your information, each of you signed a Stock Repurchase Agreement on August 31, 1989.  This Agreement restricts your right to sell or transfer your shares of stock in the corporation during your life.  The Agreement also sets forth the procedures to be followed should you pass away.  <u>In particular, the Agreement sets the price of your shares of stock upon your death to be either a "stipulated value" agreed to by all of you,</u> *or* **the greater of the book value of the stock or the amount of life insurance.**  The "book value" is basically the balance sheet value of the corporation.
>
> As you know, Sehi annually has Dave Barberi establish a value of the corporation's stock.  This is done for annual gifting purposes and is not the "stipulated price of a shareholder's shares upon the death of a shareholder.  Hence, the amount to be paid to your heirs upon your death under the terms of the Stock Repurchase Agreement is the greater of the book value of your stock and the face value of your life insurance.
>
> <u>This presents some interesting issues you should consider</u>.  First, upon the death of a shareholder whose value of stock in the corporation is less than the value of the life insurance, should the corporation take out any additional insurance to be compensated for the loss of a valued and key employee?  Second, upon the death of a shareholder whose value of stock in the corporation is **more** than the value of the life insurance, should the

> corporation take out any additional insurance so that his or her heirs can be fully compensated and the corporation avoid a financial hardship?  Third, much has happened with Sehi since 1989 when the Stock Repurchase Agreement was signed and should it now be revised?  <u>Fourth, do you wish to stipulate a value for the shares so as to ensure that your heirs receive from the corporation a certain value for your shares?</u>
>
> Keep in mind when you consider these alternatives, that insurance can be very expensive and in some instances persons can not be insured at any price.  Also, it is usually best to secure insurance early on to lock in a lower price for the insurance. . . .

[1/1703 letter from John P. Kelly to Sehi Stockholders, Defendant's Ex. 5 (underscoring and italics added; other emphasis in original)].

Apparently, the Sehi Stockholders considered the issues posed by Kelly's response but decided to act on only one of them -- to stipulate a value for their company stock for purposes of the Stock Repurchase Agreement.

At the April 17, 2003 Combined Annual Meeting of the Shareholders and the Board of Directors of Sehi Computer,[4] all of the Sehi Shareholders unanimously decided to stipulate that the value of a share of common stock of the corporation for purposes of the Buy/Sell Agreement be established at $40.00 per share. [*See* Minutes of the Combined Annual Meeting of the Shareholders and Board of Directors of Sehi Computer Products, Inc., held on April 17, 2003, Plaintiff's Ex. 12, pp. 3-4.] All of the Shareholders, including Jeffrey E. Sehi, signed the stipulation in the Minutes. [*See id.* at

---

[4] Charles Sehi and his children Mark, Jeffrey, Nancy, Craig and Scott constituted all of the shareholders of the corporation and all of the members of the company's board of directors.

p. 4.]

Barely three weeks later, on May 7, 2003, Jeffrey E. Sehi committed suicide in his California residence. At the time of his death, Jeffrey owned 3,374 shares of Sehi stock which constituted 11.28% of the total issued shares.[5]

On May 29, 2003, Sehi Computer delivered notice of the corporation's intent to purchase the shares of stock from the Estate of Jeffrey E. Sehi, the named Defendant in this action.[6] [*See* Plaintiff's Ex. 13.] The notice indicated that the price for the shares is the stipulated $40.00 per share, for a total purchase price of $134,960.00 for all of Jeffrey Sehi's stock. *Id.* An offer of payment of $134,960.00 was made on June 9, 2003 but rejected. [*See* Plaintiff's Ex. 14.] Defendant has demanded payment of $1 million, arriving at this figure by totaling the face value of the $500,000 Buy/Sell life insurance policy <u>and</u> the $500,000 Key-Man policy the corporation had on Jeffrey Sehi's life. After several attempts to settle the matter, Sehi Computer filed the instant breach of contract action in this Court on diversity of citizenship grounds.

---

[5] It appears that beginning sometime in 2002, Jeffrey and Judith Sehi began experiencing some marital problems and in the fall of that year, Jeffrey moved out of the marital home and rented an apartment. Much name-calling and finger-pointing has occurred among the Sehi family members and Judith Sehi concerning Mrs. Sehi's conduct in the last years of Jeffrey's life and attributing blame for Jeffrey's suicide to Judith. Although both Plaintiff and Defendant in their briefs have joined in some of this finger-pointing, none of it is of any particular relevance to the issues presented for resolution.

[6] The Estate of Jefrey E. Sehi was filed in Orange County, California.

III.  DISCUSSION

A.  STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion.  These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[7]  According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment.  They are summarized as

---

[7]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."  10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, § 2727, at 35 (1996 Supp.).

follows:

> \* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> \* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
>
> \* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> \* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.  The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts."  Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996).  *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  The Court will apply the foregoing standards in deciding Plaintiff's Motion for Summary Judgment in this case.

B.      GENERAL PRINCIPLES OF CONTRACT INTERPRETATION

Interpretation of contractual language is a question of law for the court.  *Morley v Automobile Club of Michigan*, 458 Mich. 459, 465; 581 N.W.2d 237 (1998).  It is well-settled in Michigan that, when interpreting a contract, the court must first look to the plain language of the contract.  *See Wilkie v. Auto-Owners Ins Co.*, 469 Mich. 41, 61, 664

N.W.2d 776 (2003).[8] The goal in the construction or interpretation of any contract is to honor the intent of the parties. *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127, n. 28, 517 N.W.2d 19 (1994); *UAW-GM Human Resource Ctr. v. KSL Recreation Corp.*, 228 Mich. App. 486, 491, 579 N.W.2d 411 (1998). To do so, the court must read the agreement as a whole, *Perry v. Sied*, 461 Mich. 680, 689, 611 N.W.2d 516 (2000), and attempt to apply the plain language of the contract itself. *Michigan Twp. Participating Plan v. Pavolich*, 232 Mich. App. 378, 383, 591 N.W.2d 325 (1998), quoting *Royce v. Citizens Ins. Co.*, 219 Mich. App. 537, 542-543, 557 N.W.2d 144 (1996); *Dillon v. DeNooyer Chevrolet Geo*, 217 Mich. App. 163, 166, 550 N.W.2d 846 (1996). The court does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning. *UAW-GM Human Resource Ctr. v. KSL Recreation Corp.*, *supra* (quoting *Sheldon-Seatz, Inc. v. Coles*, 319 Mich. 401, 406-407, 29 N.W.2d 832 (1947), quoting *Michigan Chandelier Co v. Morse*, 297 Mich. 41, 49, 297 N.W. 64 (1941)).

Furthermore, courts are not to create ambiguity where none exists. *Id*. Contractual language must be construed according to its plain and ordinary meaning, and this Court

---

[8] The Stock Repurchase Agreement provides that "This Agreement shall be subject to and governed by the laws of Michigan irrespective of the fact that one or more of the parties is or may be a resident of a different state." [*see* Plaintiff's Ex. 1, Article XII, Section 1201, pp. 14-15], and the parties do not dispute that Michigan law governs this action.

must avoid technical or constrained constructions. *Id*. at 491-492.   The fact that the parties may disagree as to the meaning of contract terms does not necessarily establish the existence of ambiguity in a legal sense.  *Steinmetz Elec. Contractors v. International Brotherhood of Electrical Workers*, 517 F. Supp. 428, 432 (E.D. Mich. 1981).

> The real issue is not whether the parties disagree on the meaning of terms to the contract, but whether the terms themselves are ambiguous.  If the contract terms are not ambiguous, then contradictory inferences which may be drawn are subjective, and irrelevant.

*Cleveland-Cliffs Iron Co. v. Chicago & N.W. Transportation Co*., 581 F. Supp. 1144, 1149 (W.D. Mich. 1984) (citations omitted).

It is further well-settled that the same legal principles govern with regard to contracts for the sale of stock as apply in the case of contracts generally.  *See Wheeler v. Ocker & Ford Manufacturing Co.*, 162 Mich. 204, 127 N.W. 332 (1910); *see also Concord Auto Auction, Inc. v. Lawrence H. Rustin, Administrator of the Estate of Leroy Cox*, 627 F. Supp. 1526 (D. Mass. 1986) (holding that stock agreements between shareholders and the corporation "are valid, bind the stockholder and the administrator or executor, and may be specifically enforced. . . absent any fraud, overreaching, undue influence, duress, or mistake at the time the deceased entered into the agreement. . . .") The Court will apply the foregoing principles in construing the Stock Repurchase Agreement at issue in this case.

B.   THERE IS NO AMBIGUITY IN THE VALUATION PROVISIONS OF THE STOCK REPURCHASE AGREEMENT

As indicated, contractual language is to be construed according to its plain and ordinary meaning, and the law commands that this Court avoid technical or constrained constructions. *See UAW-GM Human Resources Ctr. v. KSL Recreation Corp.,* 228 Mich. App. at 491-92. Applying the plain and ordinary meaning of the language of the Stock Repurchase Agreement, the Court finds no ambiguity in the valuation provisions of the Agreement.

The valuation provisions are clearly written and subject to only one reasonable interpretation. Although a "fall-back" valuation -- "Book Value" -- is set forth in Section 501 of the Agreement,[9] both Section 501 and Section 502 make clear that this "fall-back" valuation method is to be used only if the Stockholders never take any action to set a "stipulated price." Section 501's book valuation method provisions are prefaced by the clearly-stated caveat, "Subject to the overriding provision of the Section entitled 'Stipulated Price'. . . ." Section 502 is the provision entitled "Stipulated Price." It is prefaced by the clear caveat, "Notwithstanding the provisions of the Section entitled Book Value,'" and goes on to specifically state in clear and plain language that the Stockholders may agree that "the purchase price pursuant to this Agreement shall be an

---

[9] As indicated, "Book Value" for purposes of the re-purchase price of the deceased shareholder's stock is defined in the Agreement as the greater of (a) the product of the number of shares owned by the deceased Stockholder times the book value or (b) the total face value of life insurance owned by the Corporation on the life of the deceased Stockholder. *See* Stock Repurchase Agreement, Article V, § 501.

amount which has been agreed by them <u>rather than an amount to be determined under the valuation method provided in the Section entitled "Book Value."</u> [*See* Plaintiff's Ex. 1, §§ 501-502.] The language used is clear and unambiguous and has a definite meaning.

Notwithstanding this clear language, Defendant argues that the ambiguity of the Repurchase Agreement was made evident by the stockholders' own questioning of its meaning. Defendant refers to the question posed by Scott Sehi to the underwriter which was answered by the Corporation's attorney. However, as indicated above, the Court may not look to extrinsic evidence to determine the contractual intent of the parties when the words used by them are clear and unambiguous and have a definite meaning. *UAW-GM Human Resource Ctr. v. KSL Recreation Corp., supra*, 228 Mich. App. at 491. Furthermore, "[i]f contract terms are not ambiguous, then contradictory inferences which may be drawn are subjective, and irrelevant." *Cleveland-Cliffs Iron Co. v. Chicago & N.W. Transportation Co. supra*, 581 F. Supp. at 1149.

Moreover, even if the Court were to consider Attorney Kelly's letter written to the shareholders in response to Scott Sehi's question, Mr. Kelly's letter answered the question consistent with the plain language in the Agreement. Kelly wrote,

> [T]he Agreement sets the price of your shares of stock upon your death to be either a "stipulated value" agreed to by all of you <u>or</u> the greater of the book value of the stock or the amount of life insurance.

[Defendant's Ex. 5, p. 2, (emphasis added).]

While it is true that, at the time when Kelly wrote his letter, the Stockholders had

14

not yet agreed upon a "stipulated value" and, hence, Kelly told the shareholders that, as of the date of his letter -- February 17, 2003 -- "the amount to be paid to your heirs upon your death under the terms of the Stock Repurchase Agreement is the greater of the book value of your stock and the face value of your life insurance," Kelly himself proposed several issues that the shareholders might want to consider, one them being whether they wanted to stipulate to a value for their shares. *Id.*

The shareholders decided to act on Kelly's suggestion and two months later, on April 17, 2003, at the Annual Joint Meeting of the Sehi Shareholders and Board of Directors, all of the shareholders -- including Defendant's decedent, Jeffrey E. Sehi -- agreed in a written resolution to establish the value of a share of stock in the Corporation for purposes of the Stock Repurchase Agreement as $40.00 per share. *See* Plaintiff's Ex. 12. All of the Shareholders -- including Defendant's decedent, Jeffrey E. Sehi -- approved and signed the valuation resolution. *Id.*

Defendant cannot now be heard to argue that Jeffrey Sehi did not intend to agree to a stipulated value of $40.00 per share.[10] No evidence has been presented to contradict the clear evidence of record which shows otherwise. Conclusory allegations, which is, at best, all that Estate here has offered to support its position, are insufficient to withstand a

---

[10] Defendant argues that the Court should consider that the Company should not benefit from what the Estate now views as an "unconscionable" undervaluation of stock. However, a disparity between the stipulated price and the current value of the stock is not enough to prevent specific enforcement of a shareholder agreement. *See Concord Auto Auction, Inc. v. Estate of Leroy Cox*, *supra.*

properly-filed motion for summary judgment. *White v. York Int'l Corp.*, 45 F.3d 357, 361 (6th Cir. 1995).

## CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment be, and hereby is, GRANTED. Accordingly,

IT IS FURTHER ORDERED that Defendant shall promptly deliver all shares of stock of Sehi Computer Products, Inc. f/k/a Procomp Computer Products, Inc. in its possession in exchange for Sehi's payment of the sum of $134,960.00.[11]

Let Judgment be entered accordingly.


              s/Gerald E. Rosen
              Gerald E. Rosen
              United States District Judge

Dated: July 15, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 15, 2005, by electronic and/or ordinary mail.

---

[11] Although Sehi has requested that it be allowed to deduct from the purchase price "costs, expenses and attorney fees incurred by Plaintiff in connection with this action," because there is no provision in the Agreement providing for such relief, the Court will not allow Plaintiff to *sua sponte* deduct these sums from the purchase price. However, the Court will consider a properly-filed verified and itemized application for attorneys' fees from Plaintiff's counsel. Further, as the prevailing party, Plaintiff is entitled to submit a bill of costs pursuant to 28 U.S.C. § 1920.

s/LaShawn R. Saulsberry
Case Manager